**BOIES SCHILLER FLEXNER LLP**
WILLIAM S. OHLEMEYER,
    NY State Bar No. 3995651
    (*Pro Hac Vice* to be filed )
    *wohlemeyer@bsfllp.com*
333 Main Street
Armonk, NY 10504-1812
Telephone:   (914) 749-8200
Facsimile:   (914) 749-8300

**BOIES SCHILLER FLEXNER LLP**
SHIRA LIU, State Bar No. 274158
    *sliu@bsfllp.com*
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Telephone:   (310) 752-2400
Facsimile:   (310) 752-2490

Attorneys for Plaintiff
JUSTIN MENKES

BOIES SCHILLER FLEXNER LLP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JUSTIN MENKES,<br><br>        Plaintiff,<br><br>    v.<br><br>SSI (US), INC., a Delaware Corporation, d/b/a SPENCER STUART, and SPENCER STUART, INC.<br><br>        Defendant. | Case No. 19-cv-1367<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **TRADE LIBEL**<br>2. **SLANDER OF TITLE**<br>3. **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>4. **INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>5. **DEFAMATION**<br>6. **UNLAWFUL, UNFAIR, AND FRAUDULENT BUSINESS PRACTICES [CAL. BUS. & PROF. CODE § 17200 *et seq.*]**<br>7. **DECLARATORY RELIEF [CAL. CODE CIVIL PROC. § 1060]**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Justin Menkes, Ph.D., by and through his attorneys, alleges as follows:

## **INTRODUCTION**

1.    This case involves the efforts of SSI (US), INC. a Delaware Corporation, d/b/a SPENCER STUART, and SPENCER STUART, INC. (hereinafter "Spencer Stuart") to prevent a former employee—Justin Menkes—from commercializing an interactive assessment tool that Dr. Menkes, through hours of work and substantial personal and outside investment, developed after ending his relationship with Spencer Stuart.

2.    Dr. Menkes worked for, and was paid by, Spencer Stuart as a Consultant from 2002 to 2015.  In that capacity, Dr. Menkes helped build Spencer Stuart's CEO succession and assessment practices and contributed to numerous CEO succession studies.  On January 3, 2015, Dr. Menkes resigned from Spencer Stuart.

3.    After Dr. Menkes's resignation, he sought to develop *PositionMatch*, a software platform designed for employers making hiring decisions.  When Dr. Menkes tried to market the *PositionMatch* software solution to major corporations including, for example, Solera Holdings Inc., and Keurig Inc., Spencer Stuart's partners, consultants, and/or employees interfered by falsely telling individuals at such corporations that Dr. Menkes stole *PositionMatch* from Spencer Stuart and that PositionMatch was an unreliable assessment tool.  Neither of these assertions was or is true.  Indeed, Spencer Stuart's partners, consultants, and/or employees made these allegations while simultaneously negotiating with Dr. Menkes to acquire PositionMatch from Dr. Menkes.

4.    Likewise, in 2018, when Dr. Menkes entered into a contract with Ventura Partners to finance, commercialize, and market PositionMatch, Spencer Stuart interfered again, tortuously asserting that it owned *PositionMatch* and libeling Dr. Menkes. Again, this assertion was not and is not true.

BOIES  SCHILLER  FLEXNER  LLP

5.      Nevertheless, Spencer Stuart has largely succeeded in its efforts to disparage Dr. Menkes and *PositionMatch* and has, consequently, damaged Dr. Menkes' reputation and caused Dr. Menkes significant financial harm.  In this suit, Dr. Menkes seeks to recover damages for that harm.

## THE PARTIES

6.      Dr. Justin Menkes is an expert in executive search and assessment.  He has published two books on the topic, including *Executive Intelligence*, a *Wall Street Journal* bestseller, and has been featured in *Harvard Business Review* and the *New Yorker*.  He earned his Bachelor's degree with honors from Haverford College, his Master's degree in Psychology from the University of Pennsylvania, and his Doctorate degree in Organizational Behavior from Claremont Graduate University. He is currently employed by Ventura Partners, an executive search firm.  He works out of Ventura Partners' Southern California office.  Dr. Menkes is domiciled in and is a citizen of California.

7.      Spencer Stuart is an executive search and leadership consulting firm headquartered in Chicago, Illinois, incorporated under the laws of Delaware, and with an office in Los Angeles.  In 2016, Spencer Stuart reported $699 million in revenue, making it the second largest search firm in the world.  Spencer Stuart is a citizen of Illinois and Delaware.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

9.      This Court has personal jurisdiction over Spencer Stuart under due process and California's long-arm statute, California Code of Civil Procedure § 410.10.  Spencer Stuart regularly conducts business within California and this District, including without limitation (a) by maintaining a place of business in Los Angeles; (b) by serving clients that Spencer Stuart knows or has reason to know,

-2-

within this District.  In addition, Spencer Stuart's conduct was calculated to cause injury to Dr. Menkes within this District.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred within this District.

## FACTUAL ALLEGATIONS

11.     Having departed Spencer Stuart in 2015, Dr. Menkes began development of what became *Position Match.* Interested in commercializing this innovative search tool, Dr. Menkes made a variety of contacts with companies and individuals interested in a more interactive, cost effective, and reliable executive search tool.

12.     During the spring and summer of 2017, Dr. Menkes devoted significant time and attention to the development and commercialization of *PositionMatch* with a partner, former longtime Spencer Stuart executive Nicholas Young.

13.     Throughout this time period, Dr. Menkes made efforts to identify venture capital sources to complete the "Series B" capital raise necessary to further commercialize *PositionMatch*.  Mr. Young, however, was "uncomfortable" with such an approach, encouraging Dr. Menkes to allow Spencer Stuart to supply the capital necessary to commercialize *PositionMatch*.

14.     In the spring of 2017, Dr. Menkes was engaged in fundraising discussions with a variety of sources, including Spencer Stuart, about an investment in *Position Match*. In March 2017, Spencer Stuart Consultant Jordan Brugg acknowledged to Dr. Menkes that *PositionMatch* offered potential benefits to clients, candidates, and to Spencer Stuart, without any suggestion that Spencer Stuart claimed any ownership interest in *PositionMatch.*

15.     As early as April 2017, Spencer Stuart's then Head of North America Ben Williams, now the CEO of Spencer Stuart, attended the first of a series of meetings with Dr. Menkes and Mr. Young to discuss a potential Spencer Stuart investment in *PositionMatch*.  At the meeting, Mr. Williams learned that Dr.

-3-

Menkes and Mr. Young had, at that point, been working for over a year to develop *PositionMatch*. Mr. Williams did not, at that meeting, claim that Spencer Stuart owned or had any proprietary interest in *PositionMatch*.

16.    Indeed, although Mr. Williams and Dr. Menkes met numerous times over the following 6 months to discuss a possible Spencer Stuart investment in *PositionMatch*, Mr. Williams never made any claim that Spencer Stuart owned or had any proprietary interest in *PositionMatch*.

17.    Nevertheless, on April 7, 2017, when Dr. Menkes traveled to Boston to meet with Valerie Frissora, then the head of Human Resources at Keurig, to discuss—for a third time, the possible use of *PositionMatch*, Valerie Frissora informed Dr. Menkes that *PositionMatch* was "stolen" and used "data fabricated to hide its theft." On information and belief, a Spencer Stuart representative conveyed this false information to Valerie Frissora.

18.    By June 2017, though, Spencer Stuart's Lead of CEO Practice, Jim Citrin and Consultant Lloyd Campbell were actively in discussions with Dr. Menkes and Mr. Young concerning a Spencer Stuart investment in or purchase of *PositionMatch*. Mr. Citrin and Mr. Campbell reviewed presentations describing how *PositionMatch* worked and used links to "live" versions of *PositionMatch*. In the course of these discussions, neither Mr. Citrin nor Mr. Campbell made any claim that Spencer Stuart owned or had any proprietary interest in *PositionMatch*.

19.    During these discussions, in July 2017, Mr. Citrin acknowledged that Dr. Menkes "conceived and launched" *PositionMatch*.

20.    By July 2017, Mr. Williams told Mr. Campbell that he was "impressed" with *PositionMatch*, a "huge fan of Justin's [sic]," "personally fond of Justin and Nick," and that *PositionMatch* was "as much a threat to us, as it is an opportunity." Mr. Williams made these statements without inferring, suggesting, or asserting that Spencer Stuart had any ownership or proprietary interest in *PositionMatch*.

21.     In July 2017, Spencer Stuart's most senior and well known Consultant, Tom Neff, acknowledged that Mr. Campbell was "the point person for *PositionMatch* inside Spencer Stuart," and that—along with Mr. Williams—Mr. Campbell was "actively trying to move the ball forward. . . [with regard to an investment in *PositionMatch*]" because *PositionMatch* was "more powerful than [the current Spencer Stuart assessment tool]" and because *PositionMatch* and Spencer Stuart's existing tool could "coexist and complement" each other.  Mr. Neff explicitly and "clearly [saw] the advantages and subtle powers of *PositionMatch*." In the course of making these comments, he never suggested that *PositionMatch* was proprietary to Spencer Stuart.

22.     Similarly, on July 18, 2017, Spencer Stuart's Chairman, David Daniel reported "progress" in that Spencer Stuart's Head of Leadership Advisory Services (LAS) Patrick Hynes was "intrigued" with the possibility of a Spencer Stuart investment in *PositionMatch*.  Patrick noted that he and "Ben [Williams] . . . work closely on matters like this."  Mr. Williams had asked Mr. Hynes to familiarize himself with the *PositionMatch* technology and obtain feedback from Spencer Stuart executives because Mr. Williams considered this a "hot space with some hitters getting involved" and believed that Spencer Stuart should be "kicking the tires on the underlying algorithm" because the technology involved "will be key."

23.     In July 2017, Spencer Stuart's Co-Head CEO Succession Practice, Bob Stark requested and obtained access to the *PositionMatch* assessment tool, which he "went through. . . carefully."  Mr. Stark did not assert or even suggest that Spencer Stuart owned *PositionMatch*

24.     Indeed, in July 2017, Mr. Stark acknowledged his familiarity with, and access to, *PositionMatch*, and suggested the possibility of a Spencer Stuart "partnership" with Dr. Menkes to commercialize *PositionMatch*.

25.     The same month, Consultant Lloyd Campbell's Executive Assistant Karen O'Dea requested a link to *PositionMatch* in order to allow Spencer Stuart

-5-

employees Kristin Wait, Charlie Stack, Eric Zakre, and Tim Daniels to review and complete the *PositionMatch* assessment tool.

26.    In July 2017, Mr. Campbell obtained a "thoughtful and objective" assessment of *PositionMatch* from Mr. Zakre, without any suggestion or assertion that *PositionMatch* was proprietary to Spencer Stuart.

27.    Before the end of July 2017, Spencer Stuart's then head of the Private Equity Practice and current Chairman, David Daniel, acknowledged a review of *PositionMatch* in "sufficient detail" to express an understanding of how it worked and its "potential" without any claim of ownership on behalf of Spencer Stuart.

28.    On July 22, 2017 Mr. Neff proclaimed that he "[saw] the potential [of a Spencer Stuart investment in *PositionMatch*] very clearly."

29.    Likewise, on July 24, 2017, Spencer Stuart Global Thought Leader Stephen Kelner Jr. was sufficiently familiar with *PositionMatch* to ask detailed questions about how *PositionMatch* was administered and about how it worked. Mr. Kelner did not assert that Spencer Stuart had any ownership interest in Spencer Stuart, nor did he suggest that *PositionMatch* incorporated information or technology proprietary to Spencer Stuart.

30.    Indeed, by August 2017, Ben Williams asserted that it was "impressive to see all that [Nick Young] and Justin have accomplished," and that he was "very interested in figuring out how to invest and partner with *PositionMatch*."

31.    Early that month, Spencer Stuart executives Mr. Kelner and Mr. Hynes convened an hour-long call to discuss *PositionMatch* with Dr. Menkes.  In response to a report on the substance of the call, Mr. Daniel proclaimed *PositionMatch* to be "good stuff."

32.    In September 2017, at least one meeting was held in New York between Spencer Stuart executives and Dr. Menkes to discuss a "potential partnership" between *PositionMatch* and Spencer Stuart to commercialize the assessment tool.  By this point, nearly a dozen of the most senior Spencer Stuart

-6-

COMPLAINT

executives were familiar with the form and substance of *PositionMatch*, as well as its genesis, and none of them had made any claim of ownership or appropriation of proprietary Spencer Stuart technology.

33.    No later than September 21, 2017, Bob Stark asserted that he "[didn't] think *PositionMatch* was a tough call as long as PM's expectations can be made to align with SSI's (much like [was done] in the sale of Executive Intelligence Group), but he wants to make sure he is sending the note to the right people."

34.    By October 2017, Mr. Hynes concluded and conveyed to Mr. Williams that, having assessed the "competitive landscape," "[no one] comes close to *PositionMatch*."  Mr. Hynes made no claim that Spencer Stuart owned *PositionMatch* or that *PositionMatch* appropriated proprietary Spencer Stuart technology.

35.    On or about October 9, 2017, Mr. Hynes contacted Dr. Menkes seeking to generate a formal term sheet describing Spencer Stuart's interest in investing in, or outright acquiring, *PositionMatch*.  Mr. Hynes reiterated that Spencer Stuart was "impressed with what [Dr. Menkes] ha[d] developed to date," acknowledged Spencer Stuart's "tremendous respect for [Dr. Menkes'] capability and the intelligence [he had] brought to this endeavor so far," and expressed agreement with the "high level thinking and philosophy" around *PositionMatch* as a search tool.

36.    On or about October 12, 2017, Dr. Menkes received a "very detailed" "due diligence request list" from Spencer Stuart.

37.    The same day, Mr. Hynes forwarded a "draft term sheet" to Dr. Menkes, proposing a $1M investment in PositionMatch in exchange for 15% equity in *PositionMatch*, valuing *PositionMatch* at $6.67M.

38.    In an email dated October 14, 2017, Spencer Stuart General Counsel David Rasmussen acknowledged the need for, and execution of, a "mutual NDA." Mr. Rasmussen did not claim that Spencer Stuart had any ownership interest in *PositionMatch* or that *PositionMatch* appropriated Spencer Stuart technology.

-7-

39.     On October 19, 2017, a revised Term Sheet with substantially identical financial valuation numbers and financing documents were sent to Dr. Menkes and his attorneys.  In connection with these documents, there was no claim that Spencer Stuart had any ownership interest in *PositionMatch*, nor was there any claim that *PositionMatch* appropriated Spencer Stuart technology.

40.     Shortly thereafter, Spencer Stuart Corporate Finance Executive Keith Winter created a proposed business plan and revenue forecast which he exchanged with Dr. Menkes and Mr. Young, without any claim that Spencer Stuart had any ownership interest in *PositionMatch* or that *PositionMatch* appropriated Spencer Stuart technology.

41.     Nevertheless, on October 30, 2017, Mr. Hynes told Mr. Young that Spencer Stuart had decided not to proceed with the contemplated investment in *PositionMatch*, again without any claim of ownership of, or proprietary interest in, *PositionMatch*.

42.     On October 31, 2017, Patrick Hynes corresponded by email with Dr. Menkes, copying Mr. Rasmussen, expressing appreciation for Dr. Menkes's expression of thanks for Spencer Stuart's consideration of the *PositionMatch* investment, and stating "Appreciate the email—a lot of effort was put in on both sides and it was a pity that we did not get it over the line. We wish you all the best for the future," without any claim that Spencer Stuart had any ownership interest in *PositionMatch* or that *PositionMatch* appropriated Spencer Stuart technology.

43.     On December 7, 2017, Felicia Gorcyca, at the time Head of HR for Solera, a *PositionMatch* customer, called Dr. Menkes and informed him that she had received a call from Spencer Stuart Consultant Nicholas Alberatti on or about October 26, 2017.  Mr. Alberatti had told Miss Gorcyca that Spencer Stuart had "tested the *PositionMatch* software extensively" and that Spencer Stuart "had found [the software] to be highly inaccurate and unreliable."  Mr. Alberatti asked Miss Gorcyca whether "that was Felicia's experience as well."

44.    After learning about the conversation between Felicia Gorcyca and Mr. Alberatti, Dr. Menkes promptly called Mr. Neff to complain about Mr. Alberatti's conduct.  Mr. Neff promised Dr. Menkes that he would prevent future disparagement.

45.    On April 1, 2018, Dr. Menkes joined Ventura Partners, an executive search firm based in Beverly Hills, California.  Ventura Partners became the financial and marketing backer of *PositionMatch,* and its sales force.  Dr. Menkes joined Ventura Partners in order to commercialize *PositionMatch* and to enhance Ventura Partners' market position in the executive search field.  Ventura Partners agreed to finance the re-launch of *PositionMatch* with enhanced features.

46.    In May 2018, Ventura Partners executive Kevin Ford acknowledged the commercial potential of *PositionMatch*, advising his partners that *PositionMatch* was a "powerful differentiator."  Kevin led the firm's initiative to create marketing videos of the software.

47.    On June 6, 2018, in connection with Dr. Menkes's new position, Ventura Partners issued a press release, announcing that Dr. Menkes had joined Ventura Partners.

48.    The press release contained a discussion of Dr. Menkes's background, including his experience with Spencer Stuart, in addition to a discussion about the value of *PositionMatch*.

49.    According to the press release, "[d]uring a 15-year career with Spencer Stuart, [Dr. Menkes] was the architect of the firm's board advisory and CEO succession and assessment practice.  In addition, [he] executed multiple CEO and C-level search assignments for private equity groups including Blackstone, Clayton Dubilier & Rice and New Mountain Capital."

50.    The press release included a quote from Bob Damon, a partner at Ventura Partners and former colleague of Dr. Menkes at Spencer Stuart, who stated, "When I recruited Justin to Spencer Stuart in 2001, I knew he was special. . . . We

-9-

1  wanted to set a new standard in talent advisory and he was the architect of what we

2  achieved – CEO succession, board advisory, and assessment became central to

3  Spencer Stuart's relationships with clients."

4      51.    The press release noted that Dr. Menkes left Spencer Stuart in 2015 to

5  build *PositionMatch*.  With respect to *PositionMatch*, the press release quoted Julie

6  Ford, the founder of Ventura Partners.  Ms. Ford said, "Integrating Justin's

7  *PositionMatch* technology platform into our search process is game-

8  changing. . . . Nothing like it exists in our industry.  The integration of

9  *PositionMatch* with Ventura's total access search methodology brings us that much

10  closer to our goal of being the quality leader in our industry."

11      52.    Indeed, on or about August 1, 2018, *PositionMatch* was once again

12  made "live" and available for Ventura Partners to market and sell to its clients.

13      53.    On August 7, 2018, however, Spencer Stuart Chief Legal Officer David

14  Rasmussen sent a letter to Ms. Ford concerning, *inter alia, "*Ventura Partner[s']

15  [p]otential [u]nauthorized [u]se of Spencer Stuart's [i]ntellectual [p]roperty."

16      54.    In the letter, Mr. Rasmussen asserted that "several of the statements

17  made in the [press release] regarding [Dr.] Menkes's practices, leadership roles and

18  other achievements while at Spencer Stuart [were] blatantly false and grossly

19  fabricated."  Mr. Rasmussen further asserted that "such false and misleading

20  statements further appear in the Ventura Partners biography page for [Dr.] Menkes,

21  and [Dr.] Menkes's LinkedIn.com webpage." Rasmussen's assertions were

22  knowingly false.

23      55.    More specifically, Mr. Rasmussen knowingly and falsely claimed that

24  Dr. Menkes was only employed at Spencer Stuart for 7 ½ years and that "the leaders

25  of [the] CEO & Board practice group . . . architected that group's capabilities," not

26  Dr. Menkes.  Mr. Rasmussen further asserted that "[a]t no time during his tenure at

27  Spencer Stuart did [Dr.] Menkes have a leadership role or execute any searches."

28      56.    Moreover, Mr. Rasmussen falsely asserted  that "Mr. Damon's claim

BOIES SCHILLER FLEXNER LLP

that he recruited [Dr.] Menkes for Spencer Stuart in 2001 [was] a complete fabrication" because Dr. Menkes did not become an employee at Spencer Stuart until 2007, and that "[Dr.] Menkes's role at Spencer Stuart at no time could be described as an 'architecting role.'"

57.   Mr. Rasmussen requested that Ventura Partners "cease and desist from displaying or making false and misleading statements regarding [Dr.] Menkes['s] role while he was employed by Spencer Stuart," and notified Ms. Ford that "Spencer Stuart [would] contact [the company through which the press release was issued] to print a retraction and correction of the false and misleading statements contained in the [press release]."

58.   On August 21, 2018, Gary B. Ross, counsel for Ventura Partners, responded to Mr. Rasmussen's letter.  Mr. Ross highlighted the fact that "all parties acknowledge[d] that [Dr.] Menkes made valuable contributions to [Spencer Stuart]'s progress, over a 15-year period."

59.   In addition to false statements made by Mr. Rasmussen concerning Dr. Menkes's career at Spencer Stuart, Mr. Rasmussen also and falsely asserted that the press release "rais[ed] serious concerns that [Dr.] Menkes may have disclosed, or [would] disclose, Spencer Stuart proprietary technology and information in violation of Spencer Stuart's intellectual property rights."

60.   Finally, Mr. Rasmussen asserted that "Spencer Stuart reserve[d] all of its rights in law and equity to seek appropriate relief [from] Ventura Partners and [Dr.] Menkes to cease [any] use of [Spencer Stuart's] proprietary intellectual property and to enforce [Dr.] Menkes's obligations to Spencer Stuart with regard to such intellectual property."

61.   Nevertheless, as noted in the response to Mr. Rasmussen from Ventura Partners' attorney, Ventura Partners did not use "proprietary technology of [Spencer Stuart]" but, instead, had "its own platform, which has nothing to do with Executive Intelligence."

COMPLAINT

62.    In any event, in response to Mr. Rasmussen's false accusations and unsubstantiated threats contained in his letter to Ms. Ford, on or about August 7, 2018, *PositionMatch* was shut down and unavailable for commercial use until the threatened legal matters were resolved.

63.    Because of Spencer Stuart's knowing and recklessly false claim of ownership of *PositionMatch*, all further fundraising and marketing efforts ceased. Attempts to raise capital for a tech startup under legal threat are fruitless.

64.    Without the ability to commercialize *PositionMatch* free of Spencer Stuart's interference, Ventura Partners and Dr. Menkes are unable to finance and market *PositionMatch*, clients are unwilling to deploy *PositionMatch*, and Dr. Menkes has been unable to commercialize or monetize this innovative and potentially disruptive software system.

## COUNT I

### Trade Libel

65.    Dr. Menkes incorporates the allegations set forth in Paragraphs 1 through 64.

66.    Spencer Stuart partners, consultants, and/or employees made statements to persons other than Dr. Menkes that disparaged, or would be clearly understood to have disparaged, the quality of *PositionMatch*.

67.    Statements made by such employees were within the scope of their employment with Spencer Stuart.

68.    Those statements were untrue.

69.    Spencer Stuart partners, consultants, and/or employees that made such statements knew that the statements were untrue or acted with reckless disregard as to the truth or falsity of the statements.

70.    Spencer Stuart partners, consultants, and/or employees who made such statements knew or should have recognized that someone else might act in reliance on such statements and thereby cause Dr. Menkes to suffer financial loss.

-12-

71.     Dr. Menkes suffered direct financial harm because existing and prospective *PositionMatch* customers acted in reliance on such statements made by Spencer Stuart partners, consultants, and/or employees.

72.     Such statements made by Spencer Stuart partners, consultants, and/or employees were a substantial factor in causing Dr. Menkes's financial loss.

73.     Moreover, because the evidence indicates that Spencer Stuart acted with fraud, oppression, or malice, Dr. Menkes is entitled to punitive damages under Count I, in addition to compensatory damages.

## COUNT II

### Slander of Title

74.     Dr. Menkes incorporates the allegations set forth in Paragraphs 1 through 64.

75.     Spencer Stuart does not have an ownership stake in *PositionMatch*.

76.     Spencer Stuart partners, consultants, and/or employees made statements to persons other than Dr. Menkes indicating that Spencer Stuart has an ownership stake in *PositionMatch*, thereby casting doubt about Dr. Menkes's ownership of *PositionMatch*.

77.     Those statements were made by such partners, consultants, and/or employees in the scope of their employment with Spencer Stuart.

78.     Those statements were untrue.

79.     Spencer Stuart partners, consultants, and/or employees making such statements knew that the statements were untrue or acted with reckless disregard as to whether Spencer Stuart has an ownership stake in *PositionMatch*.

80.     Spencer Stuart partners, consultants, and/or employees making such statements knew or should have recognized that someone else might act in reliance on such statements and thereby cause Dr. Menkes to suffer financial loss.

81.     Such statements made by Spencer Stuart partners, consultants, and/or employees were a substantial factor in causing Dr. Menkes's financial loss.

-13-

BOIES SCHILLER FLEXNER LLP

82.    Dr. Menkes suffered immediate and direct financial harm because existing and prospective *PositionMatch* customers acted in reliance on such statements made by Spencer Stuart partners, consultants, and/or employees.

83.    Moreover, because the evidence indicates that Spencer Stuart acted with fraud, oppression, or malice, Dr. Menkes is entitled to punitive damages under Count II, in addition to compensatory damages.

## COUNT III

### Interference With Prospective Economic Relations

84.    Dr. Menkes incorporates the allegations set forth in Paragraphs 1 through 64.

85.    Dr. Menkes and others were in economic relationships that would have resulted in an economic benefit to Dr. Menkes.

86.    Spencer Stuart partners, consultants, and/or employees engaged in wrongful conduct that disrupted these relationships.

87.    Spencer Stuart partners, consultants, and/or employees knew of, or should have known of, those economic relationships.

88.    Spencer Stuart partners, consultants, and/or employees either intended to disrupt those economic relationships or knew that disruption of those economic relationships was certain or substantially certain to occur.

89.    At minimum, Spencer Stuart partners, consultants, and/or employees should have known that the relationship would be disrupted if they failed to act with reasonable care, and Spencer Stuart partners, consultants, and/or employees did in fact fail to act with reasonable care.

90.    The wrongful conduct by Spencer Stuart partners, consultants, and/or employees was a substantial factor in causing Dr. Menkes's harm.

91.    Dr. Menkes was harmed.

92.    Moreover, because the evidence indicates that Spencer Stuart partners, consultants, and/or employees acted with fraud, oppression, or malice, Dr. Menkes

-14-

BOIES SCHILLER FLEXNER LLP

1  is entitled to punitive damages under Count III.

## COUNT IV

### Interference With Contractual Relations

2

3

4  93.  Dr. Menkes incorporates the allegations set forth in Paragraphs 1

5  through 64.

6  94.  There was a contract between Dr. Menkes and Ventura Partners to fully

7  develop and market *PositionMatch*.

8  95.  Spencer Stuart partners, consultants, and/or employees knew of the

9  contract.

10  96.  Spencer Stuart partners, consultants, and/or employees prevented

11  performance of the contract.

12  97.  At minimum, Spencer Stuart partners, consultants, and/or employees

13  made performance of the contract more expensive or difficult.

14  98.  Spencer Stuart partners, consultants, and/or employees either intended

15  to disrupt the performance of the contract or knew that disruption of performance

16  was certain or substantially certain to result from Spencer Stuart's conduct.

17  99.  Dr. Menkes was financially harmed.

18  100.  Conduct by Spencer Stuart partners, consultants, and/or employees was

19  a substantial factor in causing Dr. Menkes's harm.

20  101.  Moreover, because the evidence indicates that Spencer Stuart partners,

21  consultants, and/or employees acted with fraud, oppression or malice, Dr. Menkes is

22  entitled to punitive damages under Count IV.

## COUNT V

### Defamation

23

24

25  102.  Dr. Menkes incorporates the allegations set forth in Paragraphs 1

26  through 66.

27  103.  Spencer Stuart partners, consultants, and/or employees made one or

28  more statements to one or more third parties other than Dr. Menkes.

-15-

BOIES  SCHILLER  FLEXNER  LLP

BOIES SCHILLER FLEXNER LLP

104. Those third parties reasonably understood that the statements were about Dr. Menkes and relate to his profession or business.

105. Spencer Stuart partners, consultants, and/or employees that made such statements made them either knowing that the statements were false or failed to use reasonable care to determine the truth or falsity of those statements.

106. These statements by Spencer Stuart partners, consultants, and/or employees were a substantial factor in causing financial harm to Dr. Menkes in his profession and business and harm to his reputation.

107. Moreover, because the evidence indicates that Spencer Stuart partners, consultants, and/or employees acted with fraud, oppression or malice, Dr. Menkes is entitled to punitive damages under Count V.

## COUNT VI

**Violations of California Business & Professions Code *§ 17200,* et seq.**

108. Dr. Menkes incorporates the allegations set forth in Paragraphs 1 through 107.

109. Spencer Stuart's business acts and practices as alleged above constitute ongoing unlawful, unfair and/or fraudulent activity prohibited by California's Unfair Competition Law ("UCL"), as codified in California Business & Professions Code § 17200 *et seq.*

110. California Business & Professions Code § 17200 prohibits any "unlawful . . . business act or practice." Spencer Stuart's business practices are unlawful for at least the following reasons:

a. Spencer Stuart's partners, consultants, and/or employees made false statements to persons other than Dr. Menkes that disparaged the quality of *PositionMatch*, with knowledge that they were untrue or with reckless disregard for their truth. The partners, consultants, and/or employees that made the false statements knew or should have known that they would cause Dr. Menkes to suffer financial

-16-

1    loss, and the statements were a substantial factor in causing

2    financial loss to Dr. Menkes.

3    b.  Spencer Stuart's partners, consultants, and/or employees made false

4        statements to persons other than Dr. Menkes indicating that Spencer

5        Stuart has an ownership stake in PositionMatch, with knowledge

6        that they were untrue or reckless disregard for their truth.  The

7        partners, consultants, and/or employees that made the false

8        statements knew or should have known that they would cause Dr.

9        Menkes to suffer financial loss, and the statements were a

10       substantial factor in causing financial loss to Dr. Menkes.

11   c.  Spencer Stuart's partners, consultants, and/or employees engaged in

12       wrongful conduct that disrupted the economic relationships between

13       Dr. Menkes and others.  Spencer Stuart's partners, consultants,

14       and/or employees knew of or should have known of the

15       relationships, and either (1) engaged in the wrongful conduct

16       intentionally to disrupt the relationships; (2) engaged in the

17       wrongful conduct knowing that disruption of the relationships was

18       certain or substantially certain to occur; or (3) failed to act with

19       reasonable care and should have known that the economic

20       relationships would be disrupted if they failed to act with reasonable

21       care.  This wrongful conduct was a substantial factor in causing Dr.

22       Menkes's financial harm.

23   d.  Spencer Stuart's partners, consultants, and/or employees knew of a

24       contract between Dr. Menkes and Ventura Partners to fully develop

25       and market *PositionMatch*, and either prevented performance of the

26       contract or made such performance more expensive or difficult.

27       Spencer Stuart's partners, consultants, and/or employees engaged in

28       this conduct either intentionally, or knowing that their actions were

-17-

BOIES SCHILLER FLEXNER LLP

certain or substantially certain to disrupt the performance of the contract. This conduct was a substantial factor in causing Dr. Menkes financial harm.

e. Spencer Stuart's partners, consultants, and/or employees made one or more statements to one or more third parties other than Dr. Menkes, those third parties reasonably understood that the statements were about Dr. Menkes and relate to his profession or business, and those statements were a substantial factor in causing financial harm to Dr. Menkes in his profession and business and harm to his reputation. The Spencer Stuart partners, consultants, and/or employees that made such statements made them either knowing that the statements were false or failed to use reasonable care to determine the truth or falsity of those statements.

111. California Business & Professions Code § 17200 also prohibits any "unfair . . . business act or practice." Through the above-described conduct, Spencer Stuart partners, consultants, and/or employees engaged in "unfair" business acts or practices that outweigh any business justification, motive, or reason. Conduct by Spencer Stuart partners, consultants, and/or employees is immoral, unethical, unscrupulous, and has injured Dr. Menkes.

112. California Business & Professions Code § 17200 also prohibits any "fraudulent business act or practice." By engaging in the above-described conduct, Spencer Stuart partners, consultants, and/or employees engaged in fraudulent business practices in that the conduct described above had a tendency and likelihood to deceive persons to whom such conduct was and is targeted. As described above, Spencer Stuart partners, consultants, and/or employees made many fraudulent misrepresentations, including those to Ventura Associates, Valerie Frissora, Felicia Gorcyca, John Wood, and Griffith Foods.

113. As a direct result of Defendants' unlawful, unfair, and fraudulent acts

-18-

and practices, Defendants received ill-gotten gains that rightfully belonged to Dr. Menkes. Dr. Menkes therefore has suffered injury in fact and has lost money or property.

114. Defendants have thus engaged in unlawful, unfair, and fraudulent business acts or practices, entitling Dr. Menkes to the remedies available under the UCL, including injunctive relief, and other such and further relief as the Court may deem proper.

## COUNT VII

### Declaratory Relief

### *(Cal. Cod Civ. Proc § 1060)*

115. Dr. Menkes incorporates the allegations set forth in Paragraphs 1 through 64.

116. An actual and immediate controversy has arisen and now exists between Dr. Menkes and Spencer Stuart regarding Spencer Stuart's ownership of *PositionMatch*.

117. Dr. Menkes seeks a declaration that Spencer Stuart does not have an ownership interest in PositionMatch under California Code of Civil Procedure § 1060.

118. A judicial declaration is necessary and appropriate at this time in order to allow Dr. Menkes to fundraise for and market *PositionMatch*.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Menkes respectfully requests the following relief:

1. A trial by jury;

2. An award of compensatory and punitive damages in an amount in excess of $75,000 to be proved at trial;

3. All costs and expenses to which Dr. Menkes is entitled, including reasonable attorneys' fees to the extent permitted by law;

4. Prejudgment and post judgment interest;

BOIES SCHILLER FLEXNER LLP

-19-

5.    A declaratory judgment that Spencer Stuart does not have an ownership interest in *PositionMatch*;

6.    An injunction preventing Spencer Stuart from publicizing additional disparaging statements regarding Dr. Menkes or *PositionMatch*; and

7.    Such other and further relief the Court deems appropriate.

## **JURY DEMAND**

Dr. Menkes demands a trial by jury on all issues so triable.

DATED:  February 22, 2019          Respectfully submitted,

BOIES SCHILLER FLEXNER LLP
WILLIAM S. OHLEMEYER
SHIRA LIU


By      /s/ Shira Liu
        SHIRA LIU
Attorneys for Plaintiff JUSTIN MENKES

-20-